**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00314-RBJ

UNITED STATES OF AMERICA,

      Plaintiff,

v.

JAMES LOVATO,

      Defendant.

_____

**MOTION TO RE-OPEN DETENTION HEARING AND FOR RELEASE OF
DEFENDANT**
_____

Defendant James Lovato, by and through his counsel, Dru Nielsen, hereby moves the Court to enter an Order directing that he be released pending trial upon any conditions deemed appropriate by the Court. Mr. Lovato states the following grounds:

**I.    Introduction**

1.    Mr. Lovato was arrested in this matter on or about July 17, 2019. On July 22, 2019 an Arraignment, Discovery and Detention Hearing was held before Magistrate Varholak.   Mr. Lovato did not contest detention and was ordered detained.

2.    Mr. Lovato is being held in the Clear Creek County Jail in Georgetown, Colorado.   Since March 12, 2020, the Clear Creek County Jail has prohibited in-person attorney visits due to the novel coronavirus.

3.    At Mr. Lovato's Detention Hearing in July 2019, the parties did not anticipate the extent to which the novel coronavirus would affect virtually every aspect of life globally.

4.     In light of the heightened susceptibility to infectious disease to which virtually all incarcerated populations are subject, the threat of widespread transmission of COVID-19 constitutes a changed circumstance that justifies the re-opening of the detention hearing and Mr. Lovato's pre-trial release subject to appropriate conditions.

## II.    Legal Authority

5.     The pre-trial detention or release of a defendant is governed by 18 U.S.C. § 3142. Generally, a defendant will only be detained after a detention hearing, and only when the Court finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).

6.     At the detention hearing, the Government bears the burden of proving risk of flight by a preponderance of the evidence, and the burden of proving dangerousness by clear-and-convincing evidence. 18 U.S.C. § 3142(f), *United States v. Cisneros*, 328 F.3d 610, 616.

7.     18 U.S.C. § 3142(e)(3)(A) creates a rebuttable presumption that no condition or combination of conditions will reasonably assure appearance and the safety of the community if there is probable cause to believe that the defendant committed an offense under the Controlled Substances Act (21 U.S.C. § 801 et seq.) punishable by 5 years or more. Because Mr. Lovato is charged in Count Three of the Indictment (Doc. 1) with possession with the intent to distribute 50 grams and more of methamphetamine, the rebuttable presumption applies to him in this case.

8.      The rebuttable presumption shifts the burden of production to the defendant. "The defendant's burden of production is not heavy, but some evidence must be produced. Even if a defendant's burden of production is met, the presumption remains a factor for consideration by the district court in determining whether to release or detain." *United States v. Stricklin*, 932 F.2d 1353, 1354-55 (10th Cir.1991).

9.      In determining whether there are conditions of release that will reasonably assure the appearance of the defendant as required and the safety of any other person and the community, the Court must consider (i) the nature and circumstances of the crime charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, drug or alcohol abuse history, and past conduct; and (iv) the nature and seriousness of the danger to the community or to an individual that would be posed by release. 18 U.S.C. § 3142(g).

## III.    Argument

**A.      The widespread community transmission of COVID-19 is a change in circumstances justifying reopening Mr. Lovato's detention hearing and granting him pre-trial release upon appropriate conditions.**

### i.      Reopening the hearing

10.      Pursuant to 18 U.S.C. § 3142(f), the detention hearing "may be reopened before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue of whether there are conditions of

release that will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community."

11.     At the time of the detention hearing, none of the parties or the Court predicted that the detention of Mr. Lovato would subject him to an increased threat of exposure to COVID-19 due to his detention. This is evidenced by the fact that neither the parties nor the Court made a single mention of "coronavirus" at the Detention Hearing held on July 22, 2019.

12.     Since Mr. Lovato's detention hearing, all of the following has occurred:

- According to the World Health Organization (WHO), as of March 24, 2020, the novel coronavirus which causes COVID-19, has infected over 372,757 people, leading to at least 16,231 deaths worldwide, (including 1,722 deaths in the past 24 hours alone).[1]

- On March 11, 2020 the WHO officially characterized the developing situation with respect to the coronavirus as a global pandemic.[2]

- On March 10, 2020, Governor Jared Polis declared a State of Emergency in the State of Colorado.[3]

---

[1]     https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200324-sitrep-64-covid-19.pdf?sfvrsn=703b2c40_2

[2]     https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020

[3]     https://www.denverpost.com/2020/03/10/coronavirus-colorado-state-of-emergency/

- As of March 26, 2020, there were more than 1,400 conformed positive cases reported in Colorado with 27 deaths linked to the virus.[4]

- As of March 25, 2020 more than 179 million Americans were subject to orders from state and local governments directing that they stay at home (or "shelter in place") to the greatest extent possible.[5] As of March 25, 2020 more than 2 million residents in the Denver metro area (including all residents of Boulder, Denver, Jefferson, Adams, Arapahoe, and Douglas counties) will be subject to orders to stay at home for all but a few essential activities.[6]

- Public health officials and experts have uniformly recognized the importance of social distancing measures as a way to slow the spread of the virus and avoid overwhelming the nation's health care infrastructure. These measures include staying at home to the greatest extent possible, isolating the infected, preventing large gatherings, restricting travel, and closing facilities like businesses and schools where the virus is easily transmitted.

---

[4] https://www.denverpost.com/2020/03/27/colorado-coronavirus-case-count/

[5] https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html

[6]    https://www.denverpost.com/2020/03/25/stay-at-home-order-coronavirus-boulder-jefferson-arapahoe-douglas-adams-counties-colorado/

13.     Clearly, the widespread transmission that has now been observed and the extreme danger the virus poses to the community were not known to the movant, Mr. Lovato, at the time of the Detention Hearing. However, even if the Court determines that widespread community transmission of the novel coronavirus does not constitute "information that was not known to the movant at the time of the hearing," the Court should re-open the detention hearing. By its terms, § 3142(f) is permissive. While it states that the hearing "may be reopened" if information exists that was not known at the time of the original hearing, it does not state the converse – that the hearing *may not* be reopened in the absence of such newly discovered information. Nor does it state that this is the *only* ground upon which a detention hearing may be reopened. That statute is clear however, that the hearing may be re-opened "at any time prior to trial."

### ii.     The public health risks associated with incarceration tilt the scales in favor of releasing Mr. Lovato

14.     Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[7] Inmates cycle in and out of BOP pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers.

---

[7]  Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

15.     The well-grounded fear that the coronavirus "will carve a deadly path through prisons and jails" has been described as a "disaster waiting to happen."[8] The same factors that make cruise ships hotbeds[9] for contagion spread, are the same conditions for jails: many people living in a closed space, shared ventilation, common food preparation space, communal living/bathing/toileting/eating, limited ability to leave the facility when symptomatic or after potential exposure to the virus. Further, the jails face the additional challenge of "jail churn"[10] where members of the community regularly move in and out of the facility bringing illnesses with them into the jail and then after infection out to the community.

16.     As it pertains to Mr. Lovato and others similarly situated, the conclusion is quite simple – as the number of people who are incarcerated during the spread of the COVID-19 pandemic is reduced, the risk of harm posed by the disease both to incarcerated populations and to the public at large is substantially lessened.

---

[8]     https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html

[9]  The CDC is currently recommending that travelers defer cruise ship travel worldwide. "Cruise ship passengers are at increased risk of person-to-person spread of infectious diseases, including COVID-19." https://wwwnc.cdc.gov/travel/page/covid-19-cruise-ship

[10]  "The pathway for transmission of pandemic influenza between jails and the community is a two-way street. Jails process millions of bookings per year. Infected individuals coming from the community may be housed with healthy inmates and will come into contact with correctional officers, which can spread infection throughout a facility. On release from jail, infected inmates can also spread infection into the community where they reside." *Pandemic Influenza and Jail Facilities and Populations,* American Journal of Public Health, October, 2009.

17.     Even in the absence of an existential threat such as COVID-19, "[i]n our society liberty is the norm, and detention prior to trial…is the carefully limited exception." *U.S. v. Salerno*, 481 U.S. 739, 755 (1987). The typical balancing of factors relevant to the Court's determination of whether a particular pre-trial detainee presents a risk of flight or of potential danger to the community must be adjusted to reflect our current reality. Everything we know about the novel coronavirus indicates that drastically reducing the number of incarcerated pre-trial detainees will dramatically reduce the chances that infection will spread within detention facilities such as the Clear Creek County Jail, where Mr. Lovato is incarcerated. By extension, if COVID-19 infections are prevented and isolated within detention facilities, the goal of limiting transmission of the virus in the community at large will be furthered, as fewer people who work at, visit, or are released from detention facilities will be exposed to the virus.

18.     It is insufficient to release only those inmates with pre-existing health conditions or exhibiting symptoms – in close confines, individuals can carry and spread the virus without exhibiting any symptoms. *See* https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html. The principles behind social distancing are based on numbers and probability. By reducing the number of *all* social interactions (not just those involving people who are symptomatic or at risk), the number of opportunities for transmission of the virus are correspondingly reduced. While it is not possible to reasonably practice social distancing in a jail or prison, detainees released to prevent the transmission of the virus generally would be able to practice social distancing at their homes.

19.     The present spread of the virus in the community and the virtually inevitable contagion within the nation's prisons and jails alters the calculus of detention and release. Every defendant who is detained rather than released is placed at heightened risk of sickness and possible death, and each detained defendant incrementally increases the risk of further uncontrolled spread in the community. Therefore, under the present circumstances the Court should only detain a defendant if there is truly no other reasonable alternative to detention (i.e., the risks of the detainee being infected or of increased community transmission are outweighed by the risks posed by a particular detainee's release). Such a situation would be exceedingly rare.

**B.     A condition or combination of conditions exists that will reasonably assure Mr. Lovato's future appearances and the safety of the community.**

20.     It should be noted at the outset that continued detention is typically not necessary to ensure the primary goals of pretrial detention—appearance in court and community safety. Statistics demonstrate that nearly everyone on pretrial release in the federal system appears in court and does not reoffend. In 2019, fully 99% of released federal defendants nationwide appeared for court, and over 98% did not commit new offenses while on bond.[11] Moreover, this near-perfect compliance rate is seen equally in federal districts with very high release rates (~70%) and those with very low release rates (~24%).[12]

---

[11] *See* AO Table H-15, http://jnet.ao.dcn/sites/default/files/pdf/H15_Ending12312019.pdf (showing a nationwide failure to appear rate of 1.1% and a rearrest rate of 1.8% in 2019).

[12] The six federal districts with the lowest release rates (average 24.37%) have an average failure to appear rate of 1.78%, while the six districts with the highest release

21.     Application of the 18 U.S.C. § 3142(g) factors with an understanding that the extremely vast majority of federal pre-trial releasees are successful compels the conclusion that the Court could impose conditions upon Mr. Lovato that would reasonably assure his future appearances and the safety of the community.

22.   Mr. Lovato is undoubtedly charged with a very serious offenses and is facing a lengthy prison sentence.   Mr. Lovato concedes that a grand jury has found probable cause as to the charged offenses and points out that he enjoys a presumption of innocence.

23.   Mr. Lovato's history and characteristics include a broad range of information for the Court to consider at a reopened detention hearing. For one, the fact that he is presently detained in a manner that presents an enhanced risk that he will be infected with the coronavirus is undoubtedly a part of his history and characteristics that should be considered by the Court.

24.   Mr. Lovato has significant ties to his community, Pueblo, Colorado. He was born and raised in Pueblo.   Mr. Lovato's parents own a home in Pueblo and would allow

---

rates (average 69.08%) have an even lower failure to appear rate of 0.42%. *See* AO Table H-15;                            Table                            H-14A, https://www.uscourts.gov/sites/default/files/data_tables/jb_h14a_0930.2019.pdf. The six districts with the lowest release rates have an average re-arrest rate of 1.10%, while the six districts with the highest release rates have an average re-arrest rate of 0.91%. *See* Table H-15. (The districts with the lowest release rates are D. Utah, E.D. Oklahoma, W.D. Arkansas, S.D. Texas, E.D. Tennessee, and S.D. California; the districts with the highest release rates are D. Guam, D. Northern Mariana Islands, W.D. Washington, D. Connecticut, D. Maine, and D. Hawaii. *See* Table H-14A.)

Mr. Lovato to reside with them.   Nobody else lives in the home except for Mr. Lovato's parents.

25.    If granted release, Mr. Lovato would self-quarantine from his 67-year-old father and his 64-year-old mother in a separate room in the house for 14 days before having close contact with them.   Neither of Mr. Lovato's parents have any criminal history.   If granted release, Mr. Lovato proposes as a condition that he remain on house arrest.   There is an operable telephone landline at the Lovato home.

26.    The risk of harm to the community could be significantly mitigated by strict supervision of Mr. Lovato by the Pre-Trial Services officers of United States Probation Department.   Additionally, Mr. Lovato could be subjected to GPS monitoring so that his whereabouts were known at all times, as well as drug and alcohol testing to ensure that substance use could not contribute to any danger to others. The risk he would pose to the community if released and strictly supervised would be minimal. To the contrary, continuing to detain Mr. Lovato in a high-risk environment poses a far greater risk to the community by increasing the danger of widespread community transmission of COVID-19 as outlined above.

**C.    The risk to incarcerated populations posed by the spread of COVID-19 constitutes a "compelling reason" for Mr. Lovato's temporary release pursuant to 18 U.S.C. § 3142(i).**

27.    Should the Court decline to reconsider Mr. Lovato's detention pursuant to 18 U.S.C. 3152(f), Mr. Lovato requests that he be temporarily released from custody pursuant to 18 U.S.C. 3142(i), which states:

"The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."

30.   For the reasons stated above, the extreme risk to incarcerated populations posed by the COVID-19 crisis is a compelling reason to release Mr. Lovato.   The continued detention of large numbers of pre-trial detainees enhances the risk of spread of COVID-19 to communities outside the detention facilities. Releasing Mr. Lovato, even temporarily, would serve to directly reduce this risk.

31.   Undersigned counsel for Mr. Lovato has conferred with Assistant United States Attorney Jason St. Julien who opposes the relief sought in this Motion.

WHEREFORE, Mr. Lovato respectfully moves this Court to re-open the Detention Hearing in this matter, and to grant him release pending trial upon whatever conditions the Court may deem appropriate.

Dated this 27th day of March, 2020.

Respectfully submitted,

 s/ Dru Nielsen
Dru Nielsen, #28775
Eytan Nielsen LLC
3200 Cherry Creek South Drive
Suite 720
Denver, CO   80209
(720) 440-8155
(720) 440-8156
dru@eytan-nielsen.com
Counsel for Defendant

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on Friday, March 27, 2020, I electronically filed the foregoing

**MOTION TO RE-OPEN DETENTION HEARING AND FOR RELEASE OF DEFENDANT**

with the Clerk of Court using the CM/ECF system, which will automatically send

notification of such filing to all opposing counsel of record.


*s/Dru Nielsen*
Dru Nielsen